CURTIS v. NEWTON et al.

(Circuit Court, D. Colorado. July 13, 1892.)

No. 172.

PRINCIPAL AND AGENT — MUTUAL RIGHTS AND LIABILITIES — SETTLEMENT — LACHES.

Where a principal, being unable to reimburse his agent for expenditures made in acquiring title to real estate for the purpose of protecting the principal's interest therein, receives a payment from the agent, and gives him a receipt in full of all demands, for the purpose of settling the whole transaction, he cannot, after remaining silent for 12 years without offering to return the money, assert any claim to the property on the theory that the agent continued to hold it in trust for him,

In Equity. Suit by Orlando Curtis against George A. Newton and others to charge said Newton as a trustee holding the legal title to real estate for complainant, and for an accounting, etc. Bill dismissed.

D. W. Jackson, for complainant.

W. L. Hartman, E. C. Glenn, and Chas. E. Gast, for respondents.

HALLETT, District Judge. January 3. 1878, complainant held a note for $1,000, made by Reuben Sherman and William B. Harmon to D. S. Foote, dated December 15, 1887, and payable one year after date. The note was secured by trust deed on the north half of fractional block 46 in the town of Pueblo. Complainant also held fifteen other notes of $200 each, and one note of $100, made by the same parties to the same payee, which were not secured. There were also two orders,—one for $150, and one for $100,—made by parties in Pueblo. These securities were obtained from Sherman & Harmon, a firm then, or a short time before, doing business in Pueblo, which then, or soon afterwards, became insolvent. Complainant was a citizen and resident of Chicago, and desirous of returning to his home, and therefore unable to attend personally to the collection of the claims. He was also in need of money for current expenses, and applied to respondent George A. Newton to borrow $100, and to attend to the collection of the notes, and the several demands above mentioned. Respondent acceded to his request, loaned $100 to him, took possession of the securities, and thereupon executed a receipt, the last clause of which reads as follows:

"The above notes and orders to be held by me as collateral security for the payment to me of $100.00, (one hundred dollars,) and, after payment of said amount, the balance, after payment of costs attending the collection of same, to be applied on payment of note of $3,000.00 given by D. S. Foote to D. C. Foote, and held by me for collection."

There was added to the receipt, without signature, the following:

"There being a note of $400.00, secured by deed of trust, prior to the note of $1,000.00 given by D. S. Foote. moneys received will first be applied to liquidating that claim unless paid by Sherman."

The first deed of trust here mentioned was also mentioned in the trust deed given by Sherman to secure the $1,000 note above

mentioned. Following this transaction, there was considerable correspondence between complainant and respondent, the former in Chicago and the latter in Pueblo, touching the collection of the notes and orders, but no part of any of them was secured.

About March 5, 1878, respondent purchased of the Bank of South Pueblo the note held by that bank secured by the first trust deed on the north half of fractional block 46, which, by the memorandum added to the receipt from respondent to complainant, was to be paid out of moneys collected for complainant's account. He paid the amount due upon the note at that time, which was $419. Complainant was advised of this purchase, and was asked to send money to make it his own; but he did not do so, probably because he, was unable to raise the amount. He did refund the $100 which he borrowed from respondent. About March 28, 1878, respondent caused the property to be advertised for sale under the first trust deed, and on April 27, 1878, he purchased the property at the trustee's sale then made.

In thus purchasing the first incumbrance on the north half of fractional block 46 from the Bank of South Pueblo, and afterwards purchasing the property itself at the trustee's sale, while he held for collection the note of Sherman and Harmon, secured on the same property, for complainant's account, it is contended that respondent became trustee for complainant in respect of the title to that property, and that he has been in that relation to complainant from the time of his purchase, in 1878, to the present day; that the rents received by respondent from the property should be charged against the amount paid by him to the Bank of South Pueblo, so far as it may be necessary to extinguish that amount; and that he should account to the complainant for the excess. This position would be entirely correct if complainant had paid to respondent the money paid to the Bank of South Pueblo before such payment was made by respondent, or within some reasonable time afterwards. By the first arrangement of the parties, respondent was to apply the money received from collections to the purchase of the first incumbrance, then in the hands of the Bank of South Pueblo. As nothing came from that source, it became necessary for complainant to take up that incumbrance in order to protect his own interest in the property. He had no reason to expect that respondent would advance money for that purpose, and look to the rents and profits of the property for repayment. In the correspondence of the parties there is abundant evidence to show that at the time of purchasing the note from the Bank of South Pueblo, and at the time of purchasing the property at the trustee's sale, and afterwards, respondent understood and believed that complainant would refund the amount paid for the note to the Bank of South Pueblo, and take the property. The letter of November 21, 1878, written by complainant to respondent, fully supports this view. He says:

"The arrangement is now complete for Mr. Henry Corwith to buy and take the title and purchase the Sherman lumber yard and property. * * * The rents will come to me as agent, which are to be earned in the future monthly,

by P. O. order or some cheap way of remitting the money. **Please** credit up the income, and make the draft down as small as you can. In other words, do as well as you possibly can in closing up this business for me, & **I** shall feel forever grateful. Mr. Corwith may possibly help me some if he ever sells it to any good advantage in the future."

This shows the complainant's misfortune from the beginning,— that he was unable to pay the $419 which respondent paid to the bank for the first incumbrance. He was willing to pay this sum, and respondent was willing to receive it; but the amount could not be got. The arrangement with Mr. Corwith was the nearest approach at any time to a settlement of the matter. Respondent explains why it was not carried out.—that complainant, or rather Mr. Corwith, demanded full title, which could not be given. Finally, in June, 1880, when it was no longer probable that complainant would take up the first incumbrance, respondent sent complainant $175, in settlement of the whole matter. Complainant received this amount, and gave a receipt in full of all demands. There is not the slightest reason to believe that any mistake or misunderstanding was made in this transaction. Complainant says that he read the receipt before signing it; and, if so, he must have understood its meaning.

In face of the facts which clearly appear in the whole record, that respondent received nothing from complainant towards getting the property in dispute, that complainant was fully advised of the manner in which respondent acquired title to the property, and stood by for upwards of 12 years without asserting his claim to the property, and without offering to refund the money which respondent had paid for the property, it is impossible to say that he has any right to the relief demanded.

At the next term the bill of complaint will be dismissed.